UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80480-CIV-MARRA

PAUL WELLER,

Plaintiff,

vs.

AT&T SERVICES, INC., a foreign
corporation and COMMUNICATIONS
WORKERS OF AMERICA, DISTRICT
3, AFL-CIO,

Defendants.
_____/

## OPINION AND ORDER

This cause is before the Court upon Defendant AT & T Corp.'s Motion for Summary

Judgment (DE 35) and Defendant CWA's Motion for Summary Judgment (DE 38).  The motions

are fully briefed and ripe for review.  The Court has carefully considered the motions and is

otherwise fully advised in the premises.

I.  Background

The facts, as culled from affidavits, exhibits, depositions, answers, answers to

interrogatories and reasonably inferred therefrom in a light most favorable to the non-moving

party, for the purpose of this motion, are as follows:[1]

---

[1] In response to Defendants' statement of undisputed material facts, Plaintiff provided a statement submitted in opposition to the statement of material facts that corresponded with the numbering scheme used by Defendants.  At the same time, Plaintiff referred to additional facts throughout his response brief that were not placed at the end of his statement of material facts as required by the local rules. S.D. Fla. L.R. 7.5.  The Court has made every attempt to isolate these scattered facts and, to the extent relevant, incorporate them into the factual portion of this Order.

Plaintiff Paul Weller ("Plaintiff' "Weller")[2] was employed by Defendant AT & T Corporation ("AT & T") beginning in 1987 and was a dues-paying member of Defendant Communications Workers of America ("CWA").  CWA is a labor organization representing employees of AT & T for purposes of collective bargaining.  During all pertinent times, Weller held the position of building technician.  Weller's duties included maintaining air conditioning, electrical and plumbing, fire safety equipment, building security and performing janitorial tasks. His primary responsibility was to perform or coordinate maintenance for an AT & T building in West Palm Beach, Florida that housed telephone switching equipment where several dozen people worked. (Am. Compl. ¶ ¶ 1, 5, DE 29; Lynetta Baldwin Decl. ¶ 4, DE 37-1; Weller Dep. 13-18, DE 37-3.)  Weller came under the departmental supervision of Lynetta Baldwin ("Baldwin") shortly after she became a Director of Corporate Real Estate for AT & T in January 2007.  Weller's immediate supervisor at the time was Lisa Newman ("Newman"), who reported to Baldwin.[3] (Baldwin Decl. ¶ 4.)

Weller was issued a company-owed cellular telephone at his request because he was

---

[2] Weller submits two declarations, one which is part of his response to the Defendants' statements of fact (DE 47). The other will be identified as DE 47-1.

[3] In response to AT & T's statement of material facts, Weller states that his "officially designated supervisor was Lisa Newman, who had been promoted from a clerical position, but who knew nothing about the various systems Weller was responsible for maintaining or repairing. She handled paper work and did not do a very good job at that. His actual supervisor was contractor Building Manager Ed Elkins, who was not an employee of AT & T, and worked in Orlando. The day Weller was removed and suspended without pay, John McDonald claimed to be Weller's supervisor, and he was an employee of Bell South and had never been designated Weller's supervisor. Weller had never met or heard of Lynetta Baldwin when he was removed from the premises by McDonald." (Weller Decl. ¶ A-2, DE 47.)  The Court notes that much of this response is conclusory, not based on Weller's personal knowledge, and non-responsive to AT & T's statement of fact.

using his personal cellular telephone too frequently for business purposes. Once he received a company-issued cellular telephone, Weller tried not to use his personal cellular telephone for business purposes and, likewise, he tried not to use his company-issued cellular telephone for personal calls. Weller understood that the company-issued cellular telephone was intended to be used for business purposes only. (Weller Dep. 44-47.)   That stated, Weller avers in his declaration that he had been using his company-issued telephone for business and personal use for three or four years prior to October of 2007, and was never disciplined until the instant messaging situation with his daughter arose. (Weller Decl. ¶ A-3, DE 47.)

Sometime in the second half of 2007, AT & T began requiring its supervisory personnel to review their subordinates' company-issued cellular telephone bills to make certain that the charges were appropriate.  In early January 2008, Newman reported to Baldwin that she had identified what appeared to be excessive cellular telephone bills accumulated by Weller during various months in 2007.  Specifically, Newman mentioned an approximately $1,600 bill for the month of October that included a very substantial amount of text messaging charges.[4]  Baldwin instructed Newman to report the situation to AT & T's Asset Protection Department so it could investigate the matter and determine what had happened. (Baldwin Decl. ¶ 5.)

Steve Garrison ("Garrison"), an asset protection area manager for AT & T, conducted the subsequent investigation. At the conclusion of the investigation in late January 2008, Garrison provided Baldwin with a Report of Investigation detailing his findings. (Baldwin Decl. ¶ 6.)  As

---

[4] Weller states that AT & T never produced "an actual bill of $1,600 or any amount and Weller was initially told he incurred charges of $30,000, $1,700 and $30,000 because Newman had erroneously combined all cell phone usage by many individuals." (Weller Decl. ¶ 3, DE 47-1.)

3

detailed in the Report of Investigation, Garrison determined that, in 2007, Weller's cellular telephone had total charges exceeding his calling plan (which was 1,500 minutes per month beginning in May) of $1,137.02 and total charges for text messaging and instant messaging of $1,843.65. For the October 2007 bill alone, the charges for Weller's company-issued cellular telephone were $1,631.69.[5] (Baldwin Decl. ¶ 7; Ex. 1 to Baldwin Decl. at DEF 0247, 0250.)

During the investigation, Garrison interviewed Weller and obtained a statement from him. As the Report of Investigation indicates, Weller claimed to be unaware of the messaging charges and attributed them to unauthorized use of his company-issued cellular telephone by his daughter. (Baldwin Decl. at ¶ 7; Ex. 1 to Baldwin Decl. at DEF 0248, 0254; Weller Dep. 50, 98.)

In conducting his investigation, Garrison also uncovered a discrepancy in Weller's timekeeping during the month of October 2007, when his cellular telephone charges were $1,631.69. Specifically, the cellular telephone records revealed calls originating from New York (and primarily placed to various numbers in New York) from October 18, 2007 through October 20, 2007. However, Weller's time reporting records reflect that he worked and was paid for a normal work shift on October 18, with October 19 recorded as a vacation day (and October 20 a weekend day when he was not scheduled to work).[6] (Baldwin Decl. ¶ 8; Ex. 1 to Baldwin Decl.

_____

[5] Weller states he was never made aware that his cell phone was being placed on a 1,500 minute plan or that he was exceeding the 1,500 minutes on said plan. He also states that he was never shown any documents substantiating these charges. (Weller Decl. ¶ A-6, DE 47.)

[6] Weller admits he was on vacation on October 18 and 19, 2007, but there was an error in coding his time for October 18, 2007. According to Weller, Elkins made the error, not him. (Weller Decl. ¶ A-8, DE 47.) Weller submits what he claims to be a timesheet, which appears to show that October 19, 2007 was coded as a vacation day. This exhibit does not address October 18, 2007. In three separate places on this document, it refers to eight hours of time. The document also states that it was prepared by Weller. (Timesheet, Ex. B, DE 47-1.) This document is unauthenticated. Weller refers to this document as Ex. C, but it is Ex. B to DE 47-1.

at DEF 0247-0248, 0251-52, 0278.)

Weller informed Garrison that he was on vacation in New York on October 18 and he used his company-issued cellular telephone for the calls originating from there during that time period.  However, he was unsure how his time was reported for that day and thought that he might have made a mistake in posting his hours worked. (Baldwin Decl. at ¶ 8; Ex. 1 to Baldwin Decl. at DEF 0248-49, 0255-56; Weller Dep. at 52-53.)  Not all of the calls that Weller made from his company-issued cellular telephone while on vacation in New York were for business purposes. (Weller Dep. at 71.)

During the course of his investigation, Garrison reported that he also found numerous apparent safety violations in the AT&T building that Weller was responsible for maintaining, such as cigarette smoking inside a smoke-free facility and blocked stairwells and landings. Weller admits that he smoked inside the smoke-free facility because he did not want to go outside. (Baldwin Decl. ¶ 9;  Ex. 1 to Baldwin Decl. at DEF 0294, 0267-77; Weller Dep. 81.) Weller points out that he was never disciplined or charged with any safety violations. (Weller Decl. ¶ A-10, DE 47.)

Garrison also discovered that Weller was storing his personal belongings inside the building. Weller acknowledges using the AT&T building to store what he characterized as an "excessive amount" of his personal items beginning in approximately March 2007. He did so without authorization. The personal items included bicycles, a washing machine, piles of firewood for his home, and a hot tub. (Baldwin Decl. at ¶ 9; Ex. 1 to Baldwin Decl. at DEF 0294, 0267-77; Weller Dep. 78-79, 86-89.)  Weller once again points out that he was never disciplined or charged with any safety violations. (Weller Decl. ¶ A-11, DE 47.)

Based on the results of Garrison's investigation, Baldwin decided to terminate Weller's employment on February 8, 2008. Baldwin determined that the excessive charges on Weller's company-issued cellular telephone and the submission of inaccurate time reporting records violated the AT&T Code of Conduct and warranted termination.[7] Weller's personnel file reflects that the contents of the Code of Conduct were reviewed with him annually from 1994 through 1998, in 2000, and in December of 2004, 2005, 2006 and 2007.  (Baldwin Decl. ¶ 10; Ex. 1 to Baldwin Decl. at DEF 0258-62, 0266.)  Plaintiff specifically recalls reviewing the Code of Conduct in December 2006.[8]  (Weller Dep. 93.)

Page 12 of the Code of Conduct provides that an obligation of AT&T employees "is to safeguard AT&T's assets. This means that AT&T employees must protect AT&T's physical property." (Ex. 2 to Baldwin Decl. at DEF 0012; Ex. 3 to Baldwin Decl. at DEF 000926.)  At pages 15 and 16 of the Code of Conduct, it states: "All AT&T employees are responsible for safeguarding and making proper and efficient use of company funds and property by following procedures to prevent their loss, theft, or unauthorized use. Company funds and property include company time … and telephones." (Ex. 2 to Baldwin Decl. at DEF 0015-16; Ex. 3 to Baldwin Decl. at DEF 000929-30.)  The Code of Conduct goes on to explain that employees should "[u]se telephones … only for legitimate business purposes. While some incidental personal use may be

---

[7] Weller claims he reported his vacation days to Elkins, who put two vacation days for October 19, 2007 into the system instead of one for each day Weller took vacation. (Weller Decl. ¶ B-6, DE 47.)

[8] In response, Weller avers that he did not undertake the unauthorized cell phone usage or make the error in reporting his time records. (Weller Decl. ¶ A-12, DE 47.)

permitted, these means of communication must never be excessive….." (Ex. 2 to Baldwin Decl. at DEF 0016; Ex. 3 to Baldwin Decl. at DEF 000930.) Weller was familiar with that Code of Conduct provision. (Weller Dep. at 98-99.)

Based on the contents of the Report of Investigation, Baldwin concluded that Weller failed to comply with these Code of Conduct provisions, in that he did not safeguard his company-issued cellular telephone and prevent its unauthorized use, and that it was used excessively and not for legitimate business purposes. (Baldwin Decl. ¶ 11.) In response, Weller states that his daughter, without his knowledge or permission, used his cell phone to set up an instant messaging account. (Weller Decl. ¶ A-14, DE 47.)

With regard to company records, the AT&T Code of Conduct explains that "[a]ccurate and complete records are critical in meeting AT&T's financial, legal, and management obligations…. Company records include employee and payroll records; vouchers; bills; time reports." (Ex. 2 to Baldwin Decl. at DEF 0016; Ex. 3 to Baldwin Decl. at DEF 000930.) The Code of Conduct requires employees to always "[p]repare records accurately and completely" and "[s]ign only records that are accurate and complete." (Ex. 2 to Baldwin Decl. at DEF 0016-17; Ex. 3 to Baldwin Decl. at DEF 000930-31.) Weller was also familiar with this Code of Conduct provision. (Weller Dep. at 99.) In his declaration, Weller states he "neither prepared the inaccurate record at issue, nor signed it." (Weller Decl. ¶ A-15, DE 47.)

Based on the contents of the Report of Investigation, Baldwin also concluded that Weller failed to comply with these Code of Conduct provisions, in that he did not prepare or submit accurate and complete time reports. Regardless of whether Weller was the individual who prepared his time reports, he was responsible for their accuracy. (Baldwin Decl. at ¶ 12.)

The AT&T Code of Conduct emphasizes, on two different occasions, that employees who do not comply with the Code of Conduct may be dismissed, even for a first offense.  (Ex. 2 to Baldwin Decl. at DEF 0003, 0030; Ex. 3 to Baldwin Decl. at DEF 000917, 00944.)  As a result of the multiple failures to comply with the Code of Conduct uncovered in the Report of Investigation, Baldwin decided Weller's conduct warranted termination of his employment. Baldwin states there was no ulterior motive for her decision. (Baldwin Decl. ¶ 13.)

CWA and AT & T have been party to a series of collective bargaining agreements establishing terms and conditions of employment for AT & T employees, including an agreement effective December 11, 2005 through April 4, 2009. (Am. Compl. ¶ ¶ 1-2; CWA's Answer ¶ 2, DE 31; Agreement, Ex. 14 to Weller Dep.)  Among the terms of the 2005 CWA/AT&T collective bargaining agreement are grievance and arbitration procedures for resolution of disputes arising under the agreement.  Article 9 of the 2005 Agreement establishes a three-step grievance procedure: Step 1 occurs between a representative of a CWA local union and first- or second-level AT&T management; Step 2 occurs between an officer of a CWA local union and third-level AT&T management; and Step 3 occurs between a representative of a CWA Vice President and AT&T Labor Relations. Disputes unresolved in the grievance procedure may be referred to binding arbitration pursuant to Article 10 of the 2005 Agreement. (Smith Decl. ¶ 2; Collective Bargaining Agreement, Ex. A, attached to Smith Decl., DE 39-5)

 Grievances which reach the third step of the procedure are not processed by the CWA local union, but by CWA staff representatives of the appropriate CWA sector. Responsibility for processing third step grievances arising under the CWA/AT&T Agreement is divided between the staff of the CWA Telecommunications & Technologies office (which process contract

8

interpretation grievances) and the staff of the geographical CWA District offices (which process discipline and discharge grievances). Third step discharge grievances arising in Florida are processed by the staff of CWA's District 3. (Smith Dep. 15-17, 66-67, DE 39-3; Laura Unger Decl. ¶.3, DE 39-6; Smith Decl.¶ 3.)

On January 16, 2008, when Weller was suspended by AT&T pending investigation of excessive charges on his AT&T-provided cell phone, he was initially suspended without pay. Later, he was paid for the period while suspended. Weller asked to consult with a local union representative, and spoke to CWA Local 3250 Vice President Ed Paradis. By e-mail of January 16, 2008, Paradis immediately complained to AT&T about Weller's suspension. Having received no response from AT&T, on January 22, 2008, Paradis contacted Weller about initiating a grievance over his suspension. (Weller Dep. 63, DE 39-1; January 16 and 22, 2008 e-mails, Ex. 2, attached to Hicks Dep., DE 39-4; Grievance Form and Weller Statement, Ex. 16 to Weller Dep.)

On February 14, 2008, CWA Local 3250 initiated a grievance over Weller's discharge, and requested information from AT&T (including time sheets, DSX ("swipe") card data, appraisals, and discipline history). (Grievance, Ex. 17, attached to Weller Dep; Information request, Ex. 18, attached to Weller Dep.)

In order to expedite the process while an employee is out of work, and because discharge decisions are made at higher levels of management, the first step of the grievance procedure is often waived in discharge cases.[9] Local 3250 and AT&T agreed to waive the first

_____

[9] Weller states that he does not know why he was not consulted about the waiver of step one or why he was not given the opportunity to confer with the supervisor who "accused him." (Weller Decl. ¶ B-8, DE 47; Smith Dep. 34-35.) The collective bargaining agreement does not

step of Weller's grievance, and met at the second step on June 27, 2008. (Smith Decl. ¶ 2; Grievance Form, Ex. 17, attached to Weller Dep.; Waiver, Ex. 19, attached to Weller Dep; Smith Dep. 34.)

By letter of July 8, 2008, AT&T denied the grievance at Step 2 of the grievance procedure. By letter of August 6, 2009, Local 3250 informed Weller of the Company's denial of the grievance and that it was being referred to CWA for processing at Step 3. (AT & T denial letter, Ex. 20, attached to Weller Dep.; August 6, 2008 letter, Ex. 21, attached to Weller Dep.)

By letter of August 5, 2008, Local 3250 referred the grievance to CWA District 3 for processing at the third step of the grievance procedure, and sent its file to District 3. By letter of August 8, 2008, District 3 staff notified AT&T of the referral of the grievance to Step 3, seeking reinstatement and "make whole" relief for Weller. The grievance was assigned to CWA Representative Sarah Smith, who was responsible for processing discipline and discharge grievances under the CWA/AT&T Agreement within CWA's District 3. (August 5, 2008 letter, Ex. 5, attached to Weller Dep.; August 6, 2008 letter, Ex. 21, attached to Weller Dep.; Smith Decl. ¶¶ 3-4; August 8, 2008 letter, Ex. B, attached to Smith Decl.)  Smith had not received legal training nor does she conduct legal research.  Smith has presented in an arbitration hearing about two dozen times, and has been called upon to decide whether to or not to arbitrate approximately 100 times per year. (Smith Dep. 19, 21, 24-27.)

Smith processed the Weller discharge grievance in the same manner that she processed other grievances. She reviewed the information provided by the Local, including email

_____

require the involvement of the grievant at these stages of the process. (Grievance Procedures, Ex. A., Smith Decl.)

correspondence between the Local and AT&T over Weller's suspension; the Local's notes of

discussions and meetings with management over the investigation and discharge; the grievance

form and Weller's statement; the Local's request for information from AT&T and the

Company's response, including work history and appraisals and the security investigation report;

information and documentation from Weller about discrepancies in his time reporting and pay;

and information from Weller's unemployment claim.[10] (Smith Dep. 32-33, 37-38; Smith Decl.¶

¶ 4-5.) Smith did not request from AT & T the document that AT & T claimed Weller falsified

and she did not receive the time sheets Weller entered. (Smith Dep. 47, 60-61, 89-90, DE 47-2.)

Smith was aware that, in the past, there had been payroll discrepancies relative to Weller, and she

had received information from Local 3250, including some check stubs. (Smith Dep. 36-38.)

Smith stated she was not sure what the check stubs "were suppose to be saying," and she did not

discuss it with either the Local's representative or Weller. (Smith Dep. 38.) She did, however,

receive a letter from the Local's representative stating that Weller's supervisor had previously

incorrectly coded his timesheet, resulting in an overpayment, for which Weller notified his

supervisor.[11] (Smith Dep. 80-82; August 5, 2008 letter from Paradis to Smith, Ex. 6, attached to

Smith Dep, DE 47-2.) Smith learned from AT & T, not Weller, that the computers are set up to

---

[10] Weller responds that Smith never contacted him. (Weller Decl. ¶ B-11, DE 47.) Weller also states that Smith did not have the unauthenticated timesheet which was critical to his defense. (Timesheet, Ex. B, DE 47-1.) When Smith was shown the unauthenticated timesheet, she testified that she did not know until the deposition that "a contractor could ever go into our system" and that the Local representative never provided this document to her. (Smith Dep. 50-52.) The remainder of Weller's statements in response to this statement of fact fail to provide any record citation.

[11] The Local official previously argued that Weller would not have risked losing his job over one vacation day, whereas Smith speculated Weller might have wanted to preserve a vacation day. (Smith Dep. 57-58, 81)

pay employees eight hours a day, and if there is a deviation from that, the employee must enter the change. (Smith Dep. 46.)

Smith contacted her AT&T Labor Relations counterpart Susan Evans to discuss the case.  They discussed AT & T's reasons for the discharge, and Smith requested additional information about time reporting procedures. Smith and Evans agreed to put the grievance in recess pending AT & T's response to Smith's request for information. (Smith Dep. 46, 62-63; Smith Decl. ¶ 5.)

In October of  2008, Weller called Smith to inquire about his grievance, and they discussed the grievance.[12]  Smith and Evans conferred about the grievance again on November 20, 2008.  Evans responded to Smith's questions about time reporting procedures. Evans stated that AT & T's position was that discharge was appropriate because of the nature of the misconduct. She also stated that Weller had stored many personal items in the Company facility. Smith argued that the Company could not rely on the issue of personal items being stored by Weller because it was not a basis for the original decision to discharge him. AT&T would not agree to any resolution of the grievance. (Smith Decl. ¶ 5.)

By letter of November 25, 2008, AT&T denied the grievance at the third step of the grievance procedure. It was Smith's responsibility to recommend whether or not to refer

---

[12] Smith explained her procedure when she receives a telephone call from a grievant. Smith testified that she gets "a lot of calls" and when people call, she asks their names and "get[s] the file so that I don't mess up trying to talk to somebody and it be the wrong person . . . as soon as I get the file and I look 'oh that's the one about the text messaging.' I always make sure I get the name. And I have the file in front of me if I'm going to talk to someone."  (Smith Dep. 43.)

the grievance to arbitration. Based on her review of the information in the grievance file and the

fact that there were two allegations of misconduct (personal cell phone usage and time reporting),

it was Smith's judgment that CWA would not prevail in arbitration.[13] By letter of December 3,

2008, she advised Weller of her decision and advised him of his right to appeal her decision to

the District 3 Vice President. (Smith Dep. 30, 32-33, 37-38, 68-69; Smith Decl. ¶ 6; December 3,

2008 letter, Ex. 6, Weller Dep.)  Smith did notify the vice-president of labor relations that

AT & T requested arbitration for the sole purpose of protecting Weller's time limits in the event

Weller opted to appeal her decision not to pursue arbitration. (December 3, 2008 letter, Ex. 5,

Smith Dep.)

By letter of December 17, 2008, Weller appealed Smith's decision not to

arbitrate the discharge grievance to the Vice President of CWA District 3. Weller's appeal was

considered by CWA's District 3 Vice President Beverly Hicks. By letter of January 7, 2009,

Hicks informed Weller that she had his appeal, would review the file, and notify him when she

completed her review. (January 7, 2009 letter, Ex. 24, attached to Weller Dep.)

Hicks reviewed the information in the grievance file, and spoke to Smith about the case.

She did not treat this grievance differently than others.[14] (Hicks Dep. 7-8, 17, 35-36, 52.) By

letter of February 23, 2009, Hicks notified Weller that his appeal was denied, and informed him

of his right to appeal her decision to the President of CWA within 30 days of his receipt of her

---

[13] Smith never had a case wherein an individual was accused of excessive cell phone usage and misrepresenting a time record. (Smith Dep. 32.)

[14] Weller denies this statement, claiming that because Smith did not have the unauthenticated document that "exonerated" him from "document falsification," Hicks did not have the document either.

decision. (February 23, 2009 letter, Ex. 25, attached to Weller Dep.)  Weller received Hicks

February 23, 2009 letter informing him of the decision on March 3, 2009. (Plaintiff's Response

to CWA's Requests for Admission ¶ 12, DE 39-7.)

By letter of April 13, 2009, Weller appealed Hicks' denial of his appeal to

CWA President Larry Cohen. By letter of April 17, 2009, Cohen informed Weller that he had

received his appeal and would advise him of his decision after review of the file. By letter of

May 15, 2009,  Cohen notified Weller that his appeal of Hicks' decision was denied as

untimely, as it was received more than 30 days after Weller's receipt of Hicks' decision on

March 3, 2009. Cohen also notified Weller of his right to appeal to the CWA Executive Board.

(Hicks Dep. 56-57; April 13, 2009 letter, Ex. 26, attached to Weller Dep.; April 27, 2009 letter,

Ex. 27, attached to Weller Dep. May 15, 2009 letter, Ex. 28, Weller Dep.)

By letter of May 20, 2009, Weller appealed to the CWA Executive Board. By

letter of June 1 CWA Secretary-Treasurer Jeff Rechenbach informed Weller that his appeal to the

Executive Board was received, and that he would be advised of the decision. By letter of

October 14, 2009, Rechenbach notified Weller that his appeal to the Executive Board

was denied. (Hicks Dep. 63; May 20, 2009 letter, Ex. 29, attached to Weller Dep.; June 1, 2009

letter, Ex. 30, attached to Weller Dep.; October 14, 2009 letter, Ex. 31, attached to Weller Dep.)

Weller has no reason to believe that Sarah Smith, Beverly Hicks, Larry Cohen nor

any member of the CWA Executive Board has any personal animus against him. He does not

know the reason that CWA decided not to arbitrate the discharge grievance. He does not know

what information Smith had when she made the decision not to arbitrate the grievance; he

does not know the reason for her decision; and he has no knowledge or information that

Smith handled his grievance differently than others for which she was responsible. He does not know what information was sent to CWA in conjunction with his internal appeal of Smith's decision. (Weller Dep.  66-67, 165-167, 186-187.)

At the same time, Weller states that he did not know that Smith lacked the critical document which he claims demonstrated he did not falsify his records, and when he tried to establish if she had all the documents in question, she would not answer him.  This document was important since Smith stated that the cell phone issue was easier to resolve than the falsification of the records. (Weller Decl. ¶ B-21, DE 47.)  Weller testified that he did not know "as a fact" the reasons why CWA made the decision not to arbitrate but he had a "gut feeling." (Weller Dep. 67.)  He also testified that he did not know what information Smith had when she made her decision not to arbitrate or the basis of her decision. (Weller Dep. 186-87.)  Weller stated that he does not contend that any of the CWA personnel involved in the decision not to arbitrate the grievance had any personal animosity towards him. (Weller Dep. 166-67.)   But Smith became "defensive" and told Weller that she would not turn over documents to him without a subpoena.[15] (Weller Decl. ¶ 10, DE 47-1.)

_____

[15] In response to Defendants' statement of undisputed material facts, Weller raised numerous hearsay objections to evidence AT & T relied upon in terminating Weller.  What is at issue with respect to this evidence is whether AT & T believed the reasons it terminated Weller were true, and not whether they were correct in that belief.  Cf. Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010) (in a Title VII action, showing only that the employer's proffered reason is false does not necessarily entitle a plaintiff to get past summary judgment); Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir.1989) ("even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation."); Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("if the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated section 1981").  For that reason, Weller's

II. Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct

hearsay objections miss the mark.

16

discovery, it must come forward with affirmative evidence to support its claim.  <u>Anderson</u>, 477

U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not

suffice; there must be enough of a showing that the jury could reasonably find for that party."

<u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-

moving party "is merely colorable, or is not significantly probative, then summary judgment may

be granted."  <u>Anderson</u>, 477 U.S. 242, 249-50.

III.  Discussion

      Here, Weller has brought suit against both his employer, AT & T, and the union, CWA,

for breach of the collective bargaining agreement and breach of the duty of fair representation.

<u>DelCostello v. International Brotherhood of Teamsters</u>, 462 U.S. 151, 163-64 (1983).  These

types of suits are called section 301 hybrid claims.  <u>Coppage v. U.S. Postal Service</u>, 281 F.3d

1200, 1203-04 (11th Cir. 2002).  To prevail, a plaintiff must demonstrate both that the collective

bargaining agreement was breached and that the union breached its duty of fair representation.

<u>DelCostello</u>, 462 U.S. at 165.  Thus, these claims are interdependent, and to make out a claim for

the breach of the duty of fair representation, a plaintiff must also  prevail on his hybrid claim.

<u>DelCostello</u>, 462 U.S. at 164 <u>quoting</u> <u>United Parcel Serv., Inc. v. Mitchell</u>, 451 U.S. 56, 66-67

(1981) ("the two claims are inextricably interdependent"); <u>see</u> <u>also</u> <u>Parker v. Conners Steel Co.</u>,

855 F.2d 1510, 1521 (11th Cir. 1988) ("Because the employees have failed to show any facts to

support their claims that the Union breached its duty of fair representation . . . the employees'

hybrid § 301/fair representation claim and their separate claim for breach of the Union's duty of

fair representation must fail"); <u>Smith v. Babcock & Wilcox Co. Refractories Div., Augusta, Ga.</u>,

726 F.2d 1562, 1564 (11th Cir. 1984) ("The indispensable predicate for a § 301 action, therefore,

is a showing that the union has breached its statutory duty of fair representation.")

A.  Duty of Fair Representation

In addressing the breach of the duty of fair representation, the Eleventh Circuit has stated

the following:

> [T]he employee must show that the union's handling of the grievance was either arbitrary, discriminatory, or done in bad faith. Harris v. Schwerman Trucking Co., 668 F.2d 1204, 1206 (11th Cir.1982); see also Vaca v. Sipes, 386 U.S. 171, 190 (1967). An example would be when a union arbitrarily ignores a meritorious grievance or is perfunctory in its processing of the grievance. Id.
>
> We note that a union is allowed considerable latitude in its representation of employees. The grievance and arbitration process is not conducted in a judicial forum and union representatives are not held to strict standards of trial advocacy . . . Cases are uniform in holding that neither negligence on the part of the union nor a mistake in judgment is sufficient to support a claim that the union acted in an arbitrary and perfunctory manner. Harris, 668 F.2d at 1206 (citations omitted).

Parker v. Connors Steel Co., 855 F.2d 1510, 1520-21 (11th Cir. 1988).

Furthermore, while "[i]t is beyond doubt that the duty of fair representation includes an

obligation to investigate and ascertain the merit of employee grievances," the duty of

representation "does not confer an absolute right on an employee to have his complaint carried

through all stages of the grievance procedure." Turner v. Air Transport Dispatchers' Ass'n., 468

F.2d 297, 299 (5th Cir. 1972).[16]  An employee has no absolute right to have a grievance taken to

arbitration. Vaca, 386 U.S. at 191. As long as the decision not to arbitrate made on behalf of the

employee is done "honestly and in good faith," the union's duty is not breached.  Id. at 192; see

---

[16] The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

18

International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 51 (1979).  Nor can the

breach of the duty of fair representation be established "merely by proof that the underlying

grievance was meritorious." Vaca, 386 U.S. at 195; Freeman v. O'Neal Steel, Inc., 609 F.2d

1123, 1126 (5th Cir. 1980) ("It is settled law that a breach of the fair representation duty cannot

be based on the trial court's view regarding the probability of success on the merits of a

grievance.")

  In the instant case, the evidence demonstrates that CWA pursued Weller's grievance

through the initial steps before making the decision that it was not likely to prevail in the

arbitration proceeding.  The record evidence shows that Smith, the CWA offical who made the

decision not to pursue arbitration, considered the record, which included information provided by

Weller, and evaluated the merits of the grievance. Further, the record also demonstrates that she

handled Weller's grievance no differently than other grievances nor was she influenced by

personal animosity against Weller. In fact, at one point in the process, she contacted Weller and

advised him of his right to appeal her decision internally.  She also attempted to obtain a

settlement of the case with AT & T.  Moreover, she protected Weller's right to appeal CWA's

decision not to arbitrate by sending a letter that served to protect the time limits for his appeal.

With respect to Weller's appeal, the record demonstrates that Hicks handled Weller's appeal in

same manner as other appeals, by reviewing the file and speaking to Smith about the case.

  Nonetheless, Weller claims a genuine issue of material fact based on the following: (1)

Smith's lack of legal training and experience; (2) the failure to include Weller in step 1 and 2 of

the grievance process; (3) Smith's lack of understanding and failure to investigate the payroll

discrepancies; (4) Smith's failure to recognize Weller when they spoke on the telephone and (5)

CWA's failure to act when AT & T hired a contractor to replace him.[17]   With respect to Smith's lack of training and experience, the law is clear that "the union representative is not a lawyer and cannot be expected to function as one." Harris, 668 F.2d 1207; see Findley v. Jones Motor Freight, Inc., 639 F.2d 953, 958 (3d Cir.1981) ("to hold lay union representatives to the demanding tests applied to a trained trial lawyer would defeat the aims of informality and speedy resolution contemplated by labor-management grievance agreements.").[18]

Nor does Weller's contention regarding his lack of participation in step 1 and 2 of the grievance process create a question of fact.  Steps 1 and 2 concerned the acts taken on behalf of Weller by Local 3250, an entity that is not a party to this case, and not CWA.  Nor does the collective bargaining agreement require the involvement of Weller at these stages. (Grievance Procedure, Ex. A., Smith Decl.)  Most importantly, however, is the lack of any record evidence that Weller's grievance was treated any differently at these stages of the grievance procedure than those of similarly situated grievants. For those reasons, Weller has not shown the union breached its duty.

With respect to the payroll discrepancies, Weller contends that Smith did not request from AT & T the document that AT & T claimed Weller falsified, Smith ignored the

_____

[17] Weller does not identify whether his breach of duty of fair representation claim against the union is based upon its conduct being arbitrary, discriminatory or acting in bad faith. Throughout his brief, he uses the terms "perfunctory," "reckless" and "bad faith."

[18] Smith's failure to recognize Weller when they talked on the telephone can hardly be said to raise an issue that the union breached its duty of fair representation.  Moreover, Smith explained that she gets "a lot of calls" and when people call, she asks their names and "get[s] the file so that I don't mess up trying to talk to somebody and it be the wrong person . . . as soon as I get the file and I look 'oh that's the one about the text messaging.' I always make sure I get the name. And I have the file in front of me if I'm going to talk to someone."  (Smith Dep. 43.)

unauthenticated timesheet that he claims clears him of wrongdoing (Timesheet, Ex. B, DE 47-1),

Smith looked only at documents provided by AT & T as opposed to provided by Weller,[19] and

Smith would not share records with Weller.  In addressing these points, it is helpful to examine

Gutierrez v. Southern Bell Tel. & Tel. Co., No. 83-2757-Civ-Eaton, 1986 WL 68593 (S.D. Fla.

1986).  The issue in Gutierrez was whether the plaintiff could work due to his medical condition.

The plaintiff complained that the union should not have accepted the employer's synopsis of his

medical history.  The Gutierrez court disagreed, noting that the plaintiff had not introduced any

evidence showing the employer's synopsis was wrong or that he told the union otherwise and

they ignored him.  That court also observed that it was up to the plaintiff to provide support for

his claim of disability and that, in any event, the record did not disclose any evidence that the

plaintiff was unable to work.  Based on these facts, the court held the decision not to take the

grievance to arbitration was not improper and the plaintiff did not create a genuine issue of

material fact as to perfunctory conduct by the union.  Id. at * 8 ; see also Crawford v. AT & T,

177 F. Supp. 2d 1293, 1303 (N.D. Ga. 2000) (union did not act in perfunctory manner especially

when the plaintiff provided no evidence to refute the company's attendance records).

     Likewise, in the instant case, there was nothing improper about Smith's reliance on

documents provided by AT & T.  Furthermore, the document submitted by Weller provides no

support for his claim. Even putting aside the evidentiary problem with this document, on its face,

the document does not involve the day for which he received the code of conduct violation; that

is, October 18, 2007.  Moreover, despite Weller's contention to the contrary, the document

---

[19] In fact, the record shows that Smith examined evidence provided by Weller. (Smith Decl. ¶ 4.)

demonstrates he prepared his time sheet, not Edwin Elkins.  The document also reflects, in three separate places, that a total of eight hours of work were lodged, an amount equal to one day and not two days of work.  In other words, Weller's speculation regarding this document does not refute AT & T's basis for believing Weller was paid for a date he did not work, nor does the document undercut, in any way, AT & T's decision-making rationale. Finally, Weller's complaint that Smith did not provide him with requested documents is equally unavailing. The failure of a union to provide a plaintiff with requested documents does not rise to the level of a breach of the duty of fair representation.  See Gillerlain v. CSX Transp., Inc., No. 07-00351-KD-M, 2008 WL 2941150, at * 6 (S.D. Ala. 2008).

Hence, to the extent Weller is arguing Smith's handling of the evidence regarding payroll discrepancies demonstrates perfunctory conduct, that claim must be dismissed.  At the very worst, Smith's conduct on this point can only be considered inept.  See Ash v. United Parcel Service. Inc., 800 F.2d 409, 411 (4th Cir.1986) (per curiam) ("a flawless performance is not required to fulfill the union's duty."); Riley v. Letter Carriers Local No. 380, 668 F.2d 224, 228 (3rd Cir. 1981) ("[m]ere ineptitude or negligence in the presentation of a grievance by a union has almost uniformly been rejected as the type of conduct intended to be included within the term 'perfunctory'"); Carnes v. UPS, Inc., 51 F.3d 112, 116 (8th Cir. 1995) (negligence, poor judgment, and incompetence are insufficient to establish a breach of the duty of fair representation); Smith v. Local 7898, United Steel Workers of America, 834 F.2d 93, 96 (4th Cir. 1987) ("[a] union's exercise of its judgment need not appear as wise in the glaring light of hindsight, and a violation of the duty of fair representation is not made out by proof that the union made a mistake in judgment.")

Lastly, regarding Weller's claim that there was something untoward about CWA's failure to act when AT & T hired a contractor to replace him, the record is devoid of evidence on this point as well.  It is undisputed that Smith had no discussion with AT & T about replacing Weller with a contract employee, and she was unaware of Weller's theory regarding the replacement of union employees with contract employees until this lawsuit. (Smith Decl. ¶ 8.)  See Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991) ("[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational.")

For the foregoing reasons, the Court grants summary judgment on behalf of Defendants on the breach of duty of fair representation claim.

B.  Breach of Collective Bargaining Agreement

Based on Weller's failure to show that the union breached its duty of fair representation, the Court need not address the breach of contract claim against AT & T.  See Babcock, 726 F.2d at 1564.  For the purpose of a complete record, however, the Court will address this claim.

AT & T's Code of Conduct requires employees to safeguard its company assets, including cellular telephones, and authorizes their use only for legitimate business purposes. Weller admits familiarity with this provision of the code, and admits there was thousands of dollars of unauthorized text messages on his company-issued cellular telephone that was not for legitimate business purposes. Weller attempts to raise a genuine issue of material fact by stating that his teenage daughter accessed his company-issued telephone without his knowledge and set up the instant messaging account.  The action of Weller's daughter, however, resulted from his failure to safeguard the cellular telephone and therefore he has failed to raise a genuine dispute

23

with respect to his termination for this violation.

Likewise, Weller has failed to raise a genuine issue regarding just cause for termination as to the submission of his time-reporting records.  As with the cellular telephone, AT &T's Code of Conduct sets forth the requirements for AT & T employees, which includes preparing time reports accurately and completely and signing records that are accurate and complete. While Weller time records reflect he was working on October 18, 2007, it is undisputed he was on vacation that date.[20]

Simply put, AT & T has provided two valid reasons for termination for which Weller has failed to raise a genuine issue of material fact necessary to contest a finding of just cause.  As such, the Court finds summary judgment can be granted on behalf of Defendants' on the breach of the collective bargaining agreement.[21]

IV.  Conclusion

---

[20] Although Weller points to the unauthenticated document, the Court adopts its analysis supra with respect to Weller's reliance on it.

[21] Weller cites several cases wherein arbitrators determined there was no just cause to terminate employees.  The cases cited by Weller are inapposite.  For example,  In re Exxon Chem. Americas, 105 Lab. Arb. (BNA) 1011 (Allen 1996), there was no just cause for termination because the labor agreement did not automatically result in discharge for the offense at issue.  Here, AT & T's code of conduct allows for termination, even for a first offense.  In re Dayton Newspapers, Inc., 103 Lab. Arb. (BNA) 641 (Keenan, 1994) dealt with different facts. There, the grievant was not terminated for falsification of records and stealing, but for errors in judgment which undermined trust in his ability to handle money.  In re Sumter Elec. Cooperative, Inc., 82 Lab. Arb. (BNA) 647 (Maxwell, 1984) the employer could not make a case for falsification of records based upon the grievant using unused vacation time as sick time when the district manager had previously advised employees that unused vacation time could be transferred to sick time.  Finally, In re Standard Products Co., 89 Lab. Arb. (BNA) 8 (Thomson, 1987), the arbitrator found that the company's evidence regarding falsification of records was weak.  After reviewing the facts of that case, as well as AT & T's governing policy, the Court finds that the evidence presented by AT & T is simply stronger.   Finally, even if AT & T lacked just cause, without a breach in the union's duty, Weller's claim cannot go forward.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant AT & T

Corp.'s Motion for Summary Judgment (DE 35) and Defendant CWA's Motion for Summary

Judgment (DE 38) are **GRANTED**.  The Court will separately enter judgment for Defendants.

      **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 7th day of June, 2011.

_____

KENNETH A. MARRA
United States District Judge